UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v. ) | CRIMINAL NO. 2:16-CR-53-DBH |
| ) | |
| DAVID THURLOW, ) | |
| ) | |
| DEFENDANT/PETITIONER ) | |

**ORDER ON MOTION TO REDUCE SENTENCE**

David Thurlow has filed this second motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) on the basis of "extraordinary and compelling reasons," namely, the death of his "minor child's primary caregiver." Def.'s Mot. at 1 (ECF No. 104).[1]

On September 29, 2016, I sentenced then 28-year-old Thurlow to ten years in prison for fentanyl trafficking. J. (ECF No. 30).[2] Thurlow is imprisoned now at FCC Forrest City. A BOP record he attaches to his motion says that he is projected for release on October 19, 2024, with home detention eligibility as of April 19, 2024. (ECF No. 104-2 at 9). The government concedes that Thurlow

---

[1] I denied his earlier motion that was prepared with the assistance of "Fait Accompli Legal Services" and was filled with anomalies that made it incoherent. See Def.'s First Mot. (ECF No. 100). I consider Thurlow's new motion afresh. I also deal with the merits of the dispute notwithstanding Thurlow's passionate argument that the government has mischaracterized his circumstances and claims. See Def.'s Reply (ECF No. 115).

[2] The Court of Appeals affirmed the sentence on May 16, 2018. United States v. Thurlow, Nos. 16-2237, 16-2262 (1st Cir. May 16, 2018). On May 15, 2020, I denied Thurlow's motion for a sentence reduction. Order (ECF No. 93). The Court of Appeals affirmed that decision on October 13, 2020. Thurlow v. United States, No. 20-1569 (1st Cir. Oct. 13, 2020).

has exhausted his BOP administrative remedies.  Gov't Obj. to Def.'s Mot. at 3 n.4 (ECF No. 111) (Gov't's Opp'n).

Thurlow says he meets the "extraordinary and compelling reasons" standard for compassionate release because of the "unexpected death" of his minor children's mother after he was sentenced, and the current circumstances of the maternal grandmother (the deceased woman's mother) who stepped forward to temporarily care for the children.  Def.'s Mot. at 1, 8-9.  The grandmother is a widow.  Thurlow refers to two boys (by now, young teenagers) as his children.  They were not living with Thurlow when he committed his crime and when I sentenced him, because by then Thurlow had married another woman and the boys remained with their mother.  One of them is Thurlow's biological child; the other is not, but that distinction is immaterial to my ruling on this motion.

In referring to the "death of a family member caregiver," Thurlow is undoubtedly invoking Guideline 1B1.13 cmt. 1(C)(i), which defines "extraordinary and compelling reasons" as including "death or incapacitation of the caregiver of the defendant's minor child or minor children."[3]

---

[3] The First Circuit says there is a "growing consensus" among courts of appeals that "even though the compassionate-release statute requires a district court to ensure that any sentence reduction is 'consistent' with 'applicable' policy statements issued by the Sentencing Commission, 18 U.S.C. § 3582(c)(1)(A), the current policy statement is not 'applicable' to prisoner-initiated motions for compassionate release[.]"  United States v. Canales-Ramos, No 21-1141, 2021 WL 5832291, at *2 (1st Cir. Dec. 9, 2021).  But the First Circuit has declined to decide the issue.  Id.  I have said that Guideline 1B1.13 is not binding but that it provides helpful guidance.  See United States v. Fox, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019), aff'd, No. 19-1785 (1st Cir. July 23, 2020) ("the district court did consider other relevant circumstances not specifically enumerated in the guidelines").  That is how I approach Thurlow's motion.  Although I consult the Guideline, I would reach the same conclusion under the statute even without considering the Guideline.

In Thurlow's first motion, he told me that when and after I sentenced him, the two youngsters' mother was their caregiver, but that she had unexpectedly died in surgery in January 2017 and that the father of the boy who was not Thurlow's biological child had died years earlier. Def.'s First Mot. (ECF No. 100); Letter from Eleanor Albert (ECF No. 100-2). In denying that motion on December 15, 2020, I said that "[f]ortunately Thurlow's children have a [maternal] grandmother willing and able to care for them, as she has since January 2017." Order on Mot. to Reduce Sentence at 3 (ECF No. 102).

At this point, that is not an apt description of the situation. The grandmother chose to retire in 2019 so that she could use a resulting lump sum to help her other daughter pay for college and because she could not watch the boys while she was working. (ECF No. 104-2 at 3). The grandmother had expected to continue to work part-time to supplement her remaining retirement income, but she has been unable to do so because of the pandemic; one of the boys has a weakened immune system and she is fearful of bringing the virus home. Id. As a retiree, she has limited resources, cannot afford to maintain her car to pass state inspection, and is unable to drive the boys where they need to go. Letter from Eleanor Albert (ECF No. 114). Now almost five years after her daughter's (the boys' mother's) death, there is no question that two young male teenagers will be a handful for her.[4]

---

[4] Ms. Albert appears to be age 64. Letter from David Thurlow dated December 16, 2020 (ECF No. 103 at 2) (stating that she then was 63). Although she says she is "nearly 70 years old" (ECF No. 104-2 at 3), I credit Thurlow's more precise calculation.

3

The government says: "the financial hardship was created because she voluntarily took early retirement and has chosen not to pursue part time work as she originally planned." Gov't's Opp'n at 4 (ECF No. 111). That seems to assume, without foundation, that Thurlow had control over whether the boys' grandmother decided to retire and over her choice not to pursue part-time work. The government also seems to argue that Thurlow has the responsibility to find another caregiver. Id. at 4-5. I do not see that burden—perhaps a difficult assignment for an incarcerated defendant to meet—in this portion of Guideline 1B1.13 and its commentary. Instead, it says forthrightly that the death or incapacitation of the caregiver is an extraordinary and compelling reason. The boys' mother was their only caretaker when I sentenced Thurlow. She died after I sentenced him. I conclude that Thurlow has met the "extraordinary and compelling reasons" requirement as the Guideline defines it.[5] I would reach the same conclusion under the statutory language even without the Guideline's interpretation.

I turn therefore to another requirement of the Guideline—that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) [a statutory requirement for pretrial release]." Even without that Guideline elaboration, the compassionate release statute requires me to consider the 18 U.S.C. § 3553(a) factors, one of which is the need

---

[5] The government argues that the grandmother, not the deceased mother, is the caregiver in question for Guideline purposes, and that Thurlow has failed to establish that she is incapacitated. Gov't's Opp'n at 4. I can imagine circumstances where there is a formal successor caregiver who should be the focus, but the government has not shown that is the case here. The fact that the grandmother temporarily stepped forward upon her daughter's death (she says she assumed a "temporary guardianship" of them in 2017 (ECF No. 104-2 at 3)), does not alter the conclusion that the daughter's death was the death of the boys' caregiver.

4

"to protect the public from further crimes of the defendant." 18 U.S.C. § 3353(a)(2)(C). I reach the same conclusion under either formulation.

The grandmother says that Thurlow is a good father (ECF No. 104-2 at 4), and that she is confident he will "raise his two boys like he's supposed to" (ECF No. 114 at 1). Thurlow has a plan for how he will succeed if released. Thurlow and his father say he has a job waiting for him in his father's used car dealership business and a car with which to drive the boys where they need to go. (ECF No. 106 at 2; ECF No. 110 at 8). Thurlow attaches to his motion a letter from his girlfriend, in which she says Thurlow "has a safe place to reside [with] his children, at her home." (ECF No. 104-2 at 1-2). He says he will live in a location where the boys can remain in their same schools and have access to both him and their grandmother. Letter (ECF No. 103 at 3). He has a commercial driver's license that will eventually give him more profitable employment. Id. He has successfully completed numerous programs while in prison,[6] he teaches other inmates, Def.'s Reply at 6, and he is a trusted worker in the prison's HVAC facilities department, id. He says that he has reformed in prison and that if released under appropriate supervised release conditions he will have every incentive to behave, to prosper, and to avoid his previous criminal behavior. (ECF Nos. 106 at 6 & 104 at 9-10).

I congratulate Thurlow on all that he has done and his professed commitment to leave his criminal ways behind him. I hope that he stays on this course in the years ahead. But I cannot ignore the seriousness of Thurlow's

---

[6] He has 24 programming certificates. Def.'s Reply at 6; see Certificate Exs. (ECF No. 115-2, 1-2).

5

crime, his history, and his risk of recidivism. Thurlow engaged in a serious amount of fentanyl distribution as a manager or supervisor of five or more people. They included his mother, his brother, his then wife, his cousin, and others. PSR ¶ 17. Thurlow engaged in this egregious criminality while he was still under probation for previous state offenses, PSR ¶ 34, hardly a good omen for releasing him now on conditions. His criminal behavior started at age 15 and encompassed forgery, assault, drug possession, and driving offenses. PSR ¶¶ 24-33. By the time I sentenced him at age 28, he had accumulated 9 criminal history points and had spent several years in juvenile detention, jail, and state prison. Id. But still he continued to break the law. At age 33, Def.'s Reply at 6, Thurlow is young, reducing confidence that he has outgrown his deviant youth, and he has struggled with addiction since age 16, an addiction that, he told the Probation Officer, led to his federal trafficking offense. PSR ¶ 11. Reluctantly, I conclude that Thurlow remains a danger to the community if released now under any conditions of supervision.[7]

I am concerned about the upbringing of these two young teenaged boys given their mother's death and their grandmother's current situation. Any adult or parent would be. But Thurlow remains a danger to the safety of the community and I therefore cannot release him. I see from his filings that he is in line for the BOP's Residential Drug Abuse Program (RDAP).[8] Whether successful completion of that program can change my analysis remains to be

---

[7] I do not address the other 18 U.S.C. § 3553(a) factors that the statute and the Guideline would require me to consider if I were otherwise inclined to release Thurlow early.
[8] Thurlow says he has completed the 6-month prerequisite component, the Non-residential Drug Abuse Program. Def.'s Reply at 6. The government says that as of October 25, 2021, he was # 52 on the waiting list for the RDAP. Gov't's Opp'n Ex. A (ECF No. 111-1).

seen; at this point, there is no guarantee whether or when Thurlow will be admitted.

Accordingly, Thurlow's motion to reduce sentence is **DENIED**.

**SO ORDERED.**

**DATED THIS 15TH DAY OF DECEMBER, 2021**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**